UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PAUL BULMER,                      )
                      Plaintiff  )
                                 )
                                 )
          v.                     )          Civil Action No. 13-30089-KPN
                                 )
                                 )
MIDFIRST BANK, FSA,              )
                      Defendant  )


MEMORANDUM AND ORDER WITH REGARD TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Document No. 33)
November 14, 2014

NEIMAN, U.S.M.J.

Paul Bulmer ("Plaintiff") brings this action asserting that the assignee of his

mortgage and promissory note, MidFirst Bank, FSA ("Defendant"), its alleged agent

MidLand Mortgage Company ("MidLand") and its predecessor-in-interest and alleged

agent Wells Fargo Bank ("Wells Fargo"), failed to comply with certain federal and state

statutes and regulations when handling his mortgage arrearages.  In addition to seeking

federal and state statutory damages, Plaintiff seeks declaratory and injunctive relief

preventing Defendant from foreclosing on his Agawam property.

Plaintiff alleges in his complaint that Defendant and its agents failed to correct or

explain alleged errors pointed out in a Qualified Written Request ("QWR"), in violation of

12 U.S.C. § 2605(f) (Count 1); sent a faulty notice of right-to-cure in violation of Mass.

Gen. Laws ch. 244, § 35A (Count 2) and in noncompliance with the power of sale in the

mortgage (Count 3); charged unlawful fees and provided false information and

disingenuous forbearance agreements in violation of Mass. Gen. Laws ch. 93A (Count 4); and, in violation of Veterans Affairs regulations 38 C.F.R. §§ 36.4350 (a),(g), and (h), failed to properly consider Plaintiff for a qualified loss mitigation plan ("HAMP") (Count 7), failed to meet face to face with Plaintiff (Count 6), and failed otherwise to make reasonable efforts to cure the default (Count 5). Once discovery was completed, Defendant moved for summary judgment with regard to all counts. Plaintiff has since agreed to dismiss Count 6.

Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the parties have consented to the jurisdiction of this court. For the reasons that follow, the court will allow Defendant's motion with respect to Counts 1 and 4 through 7 but deny it with respect to Counts 2 and 3.

## I. STANDARD OF REVIEW

When ruling on a motion for summary judgment, the court must construe the facts in a light most favorable to the non-moving party. *Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003). Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" when the evidence is such that a reasonable fact-finder could resolve the point in favor of the non-moving party, and a fact is "material" when it might affect the outcome of the suit under the applicable law. *Morris v. Gov't Dev. Bank of P.R.*, 27 F.3d 746, 748 (1st Cir. 1994). The non-moving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact. *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (discussing *Celotex Corp. v. Catrett*, 477

U.S. 317, 325 (1986)).

## II. BACKGROUND

Except where noted, the following facts, which are undisputed, are construed in a light most favorable to Plaintiff.

On May 31, 2005, Plaintiff bought his home at 342 Adams Street in Agawam ("the property") by executing a $204,300 promissory note to Wells Fargo in exchange for a loan issued under the Veterans Affairs ("VA") Guaranteed Loan Program. (Defendant MidFirst Bank's Concise Statement of Facts ("Def's SOF") ¶ 1.) Plaintiff secured the loan by granting a mortgage on the property to Wells Fargo, which would on April 9, 2009, assign the mortgage to Defendant, retaining the servicing rights. (Id. ¶¶ 2, 3.) The VA Guaranteed Loan statutes and regulations are incorporated into the mortgage. (Id.)

Plaintiff fell behind on his payments to varying degrees over the years, agreed to a loan modification in 2007, and was still very much in arrears by January 1, 2010. (Id. ¶ 7.) Although, evidently, Plaintiff had sufficient assets in his retirement account to bring his payments current, it became unclear how much he owed. By his own count, he received three letters from Defendant's representatives offering inconsistent payoff amounts over a sixteen-day period. (Plaintiff's Response to Defendant's Concise Statement of Facts ("Pl's SOF") ¶ 2.) A December 28, 2009 letter from Defendant's collections law firm listed a reinstatement quote of $24,590.52 if paid by January 22, 2010; a January 7, 2010 forbearance document from Wells Fargo Home Mortgage provided a $22,874.55 figure if paid by March 7th; and a January 13, 2010 letter from the law firm stated $25,234.48 would bring the account current if paid by February 11th.

3

(Id. ¶ 5(d); Bulmer Aff. Ex. A.; Def's SOF, ¶ 10.)  As the parties acknowledged at the hearing on Defendant's motion, legal fees account for a large part of the inconsistency.

At any rate, Plaintiff maintains that he relied on the Wells Fargo quote, ultimately paying $25,911.94 on January 19, 2010, which he believed would put him two payments ahead of schedule.  (Pl's SOF, ¶ 5(d).)  Defendant contends that Plaintiff was not entitled to rely on the Wells Fargo quote and that the January 13, 2010 quote of $25,234.48 applied instead.  Accordingly, as of January 20, 2010, the balance was at best unclear.

On or about August 2, 2010, Wells Fargo transferred the servicing of Plaintiff's mortgage to MidLand.  (Def's SOF. ¶ 4.)  On August 30, 2010, MidLand contacted Plaintiff to explain that Wells Fargo had "incorrectly applied" his mortgage payments. (Id. ¶ 12.)  This "explanation" may relate to the payoff, a suspense balance that the parties agree was factored into the payoff quotes, or a matter not otherwise reflected in the record.

On November 18, 2010, MidLand mailed Plaintiff, who was again in arrears, a letter entitled "Notice of Default," which was "intended" to comply with a Massachusetts law requiring mortgage holders to send defaulting borrowers notice of curing information and to observe a grace period before exercising the statutory power of sale.  (Id. ¶ 14.); Mass. Gen. Laws. 244, § 35A.  In the Notice of Default, MidLand pegged Plaintiff's delinquency at $4,782.80, although Plaintiff believes he only owed $1,015.98 at the time.  (Pl's SOF ¶ 7(i).)  Plaintiff has since submitted evidence that he could then have cured a default of $1,015.98.  (Id.)  The next day, Plaintiff explained to MidLand that he was having difficulty making payments due to financial problems after a severe head

injury.  (Def's SOF at ¶ 15.)

Plaintiff and MidLand subsequently attempted to work out loss mitigation and mortgage assistance solutions.  (Id. at ¶¶ 15-18.)  Plaintiff contends that MidLand did not pursue these solutions in good faith, pointing in particular to a March 3, 2011 internal note by an unidentified customer service representative which states: "Please be aware that mtgr has ability to make payments, we can collect as much as he has." (Pl's SOF at ¶ 11(d).)  On April 6, 2011, MidLand approved Plaintiff for a forbearance agreement, which he signed on April 22, 2011.  (Id. ¶ 19.)  Plaintiff avers that Defendant's representatives told him that it would begin foreclosure proceedings if he did not sign that agreement.  (Pl's SOF ¶ 13(b).)

The parties presently dispute whether this forbearance agreement was an acknowledgment of the amounts due under the mortgage, thereby resolving the payoff dispute.  In addition, the parties disagree as to whether it was feasible for Plaintiff to abide by the agreement.  According to Defendant, the agreement, which required several regular monthly mortgage payments followed by a balloon payment, was feasible for Plaintiff.  (*See* Def's SOF ¶¶ 18-19; Doc. No. 34, Ex.13 P.3.)  Plaintiff disagrees, calculating that the monthly payments constituted 75% of his income.  (*See* Pl's SOF ¶¶ 11(e),(f) and 12.)  The parties agree, however, that Plaintiff thereafter was not able to meet his obligations under the agreement.  (*See* Def's SOF ¶¶ 20, 22.)

On July 15, 2011, Defendant took over servicing Plaintiff's mortgage from MidLand.  (Id. ¶ 21.)  And in January of 2012, Defendant told Plaintiff he was being considered for a mortgage assistance program similar to the Home Affordable Modification Program ("HAMP") but that he had to provide certain financial information.

(Id. ¶ 23.)  After some back and forth over the application materials, Plaintiff, on March 2, 2012, was denied such assistance for want of income.  (Id. ¶¶ 25-27.)  On March 13, 2012, Defendant's law firm sent Plaintiff a notice of acceleration of the mortgage loan. (Id. ¶¶ 28-29.)  Defendant thereafter twice sent Plaintiff mortgage assistance forms.  (Id. ¶¶ 30-31.)

On May 23, 2012, Defendant received from Plaintiff's attorney a document styled a "Qualified Written Request."  (Id. ¶¶ 31-32.)  The document requested resolution of the payoff issue.  (Doc. No. 34, Exhibit 20, P.2.)  Defendant responded by sending only the mortgage, note, and the 2007 loan modification, explaining, in essence, that it had no further information regarding the payoff issue because the matter predated Defendant's loan servicing. (*See* Doc. No. 34, Exhibit 22, P.1 ("[w]e have not included information [from before August 2, 2010] unless related to [Wells Fargo's] servicing of your client's loan and it is available to us."))

Defendant, it should be noted, has not yet foreclosed on the Plaintiff, and the extent to which his payments are currently past due is unclear.  (Def's SOF ¶ 35.)

### III. DISCUSSION

#### A.  The Forbearance Agreement

The court first addresses the April 22, 2011 forbearance agreement, since resolution of its import would simplify the analysis of Plaintiff's claims.  Defendant contends that, because Plaintiff signed the agreement, he ought not be able to argue at this time that the agreement was not feasible or to resurrect his dispute regarding the balance due after his January 2010 payoff.  Plaintiff's argument to the contrary, the court agrees.

6

The forbearance agreement, which at the time represented "the final agreement between [Plaintiff] and Midland regarding the . . . delinquency" on the loan, provided that Plaintiff would make six regular monthly payments followed by a balloon payment five times greater in order to become current. Regardless of whether the only alternative was foreclosure, Plaintiff was not required to sign the agreement, especially if he did not agree with its terms or think that he could not meet the payment schedule. Since the agreement is undisputably valid, Plaintiff cannot be permitted at this point to argue its terms or its feasibility.

This conclusion need not rest upon equitable considerations alone. The court also finds that the forbearance agreement was partially integrated -- concerning specifically the extent of and acceptable remedy for Plaintiff's delinquency -- and, accordingly, replaced any earlier agreements and eclipsed inconsistent evidence having to do with its terms. *See Chambers v. Gold Medal Bakery, Inc.*, 932 N.E.2d 1190, 1196 (Mass. App. Ct. 2013) (agreement is partially integrated if intended as final expression of one or more terms and "discharges prior agreements only to the extent that it is inconsistent with them"); *RGJ Assocs. Inc. v. Stainsafe, Inc.*, 338 F.Supp.2d 215, 244, n.56 (D. Mass. 2004) ("partially integrated contract may be supplemented with consistent additional terms but may not be contradicted") (citing 35 Massachusetts Practice § 1.26 (2001)).

## B.  Counts 1, 5 and 7: Defendant's Duties Under the Real Estate Settlement Procedure Act ("RESPA") and the Veterans Affairs Rider

Defendant argues that it is entitled to judgment on Counts 1, 5 and 7 because, as a matter of law, it complied with both RESPA and the VA regulations. For the

reasons which follow, the court comes to a different conclusion but will nevertheless grant Defendant summary judgment on these counts because, first, Plaintiff cannot demonstrate damages for purposes of RESPA and, second, Plaintiff has waived any violation of his VA protections.

### 1. RESPA

Under RESPA, a servicer must respond to any "qualified written request . . . for information relating to the servicing of [a] loan." 12 U.S.C. § 2605(e)(1)(A). A request that disputes the account balance is a qualified written request ("QWR"). *Id.* at § (e)(1)(B). In response to such a request, the servicer must "make appropriate corrections" to the borrower's account. *Id.* at § (e)(2)(A). If, after investigating the matter, the servicer believes that its account is correct, it must write to the borrower to explain or clarify its position and, if applicable, explain "why the information requested is unavailable or cannot be obtained by the servicer." *Id.* at § (e)(2)(C). If the servicer does not comply with these requirements, it is liable for actual damages caused by such noncompliance and/or, at the court's discretion, additional damages, not to exceed $2,000, to punish any violative pattern or practice. *Id.* at §§ (f)(1)(A) and (B).

Embedded in this description is a preliminary issue concerning the extent to which a servicer must address or investigate errors alleged in a borrower's QWR that may be attributable to a prior account servicer. The parties cite several cases with regard to this issue but none appears to bear on the question. For its part, Defendant cites three: *O'Connor v. Nantucket Bank*, 992 F.Supp.2d 24 (D. Mass. January 13, 2014); *Foregger v. Residential Credit Solutions, Inc.*, 2013 WL 6388665 (D. Mass. December 5, 2013); and *Kassner v. Chase Home Fin., LLC*, 2012 WL 260392 (D. Mass.

January 27, 2012). *O'Connor* concerned an overly broad, 21-page QWR that requested "30 various types of documents," and held only that a servicer may reply by providing some general documents and asking for a narrower request. 992 F.Supp.2d at 29, 37. *Foregger* did not concern accounting errors or prior servicers but, rather, simply held on summary judgment that a RESPA claim fails when a plaintiff cannot show that a servicer did not send documents in reply to his QWR or that such failure exacerbated his injuries. 2013 WL 6388665, at *5. And *Kassner* merely held that a reply to a QWR is inadequate when it contains technical errors and that, to merit relief under RESPA, those errors must result in actual damages. *Id.* at *6-*7. Plaintiff's cited decision, *Kapsis v. American Home Mortg. Servicing,* 923 F.Supp.2d 430, 448 (E.D.N.Y. Feb. 14, 2013), held only, on a motion to dismiss, that a borrower who sent a QWR did state a RESPA claim when alleging that the servicer misapplied his payments and failed to correct or sufficiently explain the alleged discrepancy.

The parties' inability to find case law on point is understandable. As District Judge Douglas P. Woodlock recently noted, there is a dearth of case law even "articulating the responsibility of a lender to respond to a . . . QWR that requests certain information related to servicing," as distinguished from information that need not be provided. *Santander Bank, Nat'l Ass'n v. Sturgis*, 2013 WL 6046012, at *13 (D. Mass. Nov. 13, 2013) (finding only one case on the topic, *McDonald v. OneWest Bank, FSB*, 929 F.Supp.2d 1079, 1094-95 (W.D. Wash. 2013).) Judge Woodlock ultimately assumed, in accord with *McDonald*, that a servicer "has a duty to respond to [a QWR] to the extent it request[s] information related to servicing." *Santander Bank,* 2013 WL 6046012, at *14.

9

In this court's view, the duty to respond to a QWR, as articulated in both *McDonald* and *Santander Bank*, would ring hollow if it did not also impart an obligation to provide the information requested. Given that all actions required under RESPA, after receipt of a QWR, are to be undertaken, if applicable, "after conducting an investigation," 12 U.S.C. § 2605(e)(2)(B)-(C), the only reasonable interpretation of the statute is that the duty to respond includes the obligation to search for and provide the information related to servicing.

Still, the question lingers as to whether this duty necessarily includes an obligation to provide, when requested in a QWR, a borrower's account information from a *prior* servicer. The court concludes that the answer to this question is yes. The RESPA statute defines "servicer" as the "person," singular, "responsible for servicing" the loan and, as a matter of syntax, appears to impose the duty to respond to a QWR only on the current servicer. 12 U.S.C. § 2605(i)(2); *see also id.* at § (3) ("The term 'servicing' means receiving" the scheduled payments and "making the payments" as required by the loan terms); *see also Johnson v. BNC Mortg. Corp.*, 2010 WL 3515800, at *3 (E.D. Mich. Sept. 8, 2010) (granting summary judgment in favor of defendant on RESPA claim because it was not the servicer when plaintiff mailed the QWR). Although a prior servicer may have a duty to respond to a QWR within a year of the service transfer, *see Rak v. Saxon Mortg. Servs., Inc.*, 2014 WL 861485, at *6, n.7 (E.D. Mich. Jan. 9, 2014) (citing 24 C.F.R. § 3600.21(e)(2)(ii), available at 6 Fed. Res. Reg. Serv. 1433.25 (Aug. 2013), 2006 WL 3948186), there is no similar limitation for current servicers. *See Manzano v. Metlife Bank N.A.*, 2011 WL 3420822, at *3 (E.D. Cal. Aug. 3, 2011). Accordingly, RESPA places the dominant burden on the current servicer, *i.e.*,

the assignee, to provide all salient servicing information in response to a QWR; the statute does not assume that all prior servicing information may simply vanish into the ether.

To be sure, there may be times when, in defiance of logic, a loan servicer does not have ready access to such prior information. In the court's estimation, however, that provides little excuse to avoid the statutory mandate. One Massachusetts bankruptcy case in particular, *In re Maxwell*, 281 B.R. 101 (Bankr.D.Mass. 2002), provides some insight into the consequences of treating the statutory obligation cavalierly. There, the court lambasted the debtor's loan servicer for a "shocking display of corporate irresponsibility" where it took over servicing a mortgage without any documentation of the payment history from the prior servicer and proceeded to conjure payoff amounts "out of thin air." *Id.* at 116-117. Citing the loan servicer's employee's testimony -- "'I go off of whatever that computer has for me . . . because that's all the information that we would have. No one would have any more or less than that,'" -- the court held that reliance on "wholly unsupported figures" could not be described as a minor error -- since the servicer "lacked sufficient information to make any computation at all," -- and concluded that the servicer's actions were "egregious and inexcusable." *Id.* at 120.

If the provisions of RESPA were not enough, the instant mortgage contains similar requirements on the part of the servicer. In Paragraph 20, it provides that "loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer," that is, the obligations either stay with the present servicer, or are transferred to the successor servicer in their entirety. Accordingly, under the mortgage, the transferee servicer, here Defendant, cannot simply stick its head in the

sand when information is requested regarding a prior servicer's records. Rather, Defendant was required to provide all servicing information relevant to Plaintiff's QWR, even if solely attributable to its predecessors. Interestingly enough, it appears that Defendant may well have had this information in its possession, as its own affiant avers:

> When servicing transferred, Wells Fargo transmitted to Midland a file which contained numerous documents related to [Plaintiff's] servicing history, including a payment history, correspondence and a Loan Modification agreement. These documents are maintained in [Defendant's] records.

(Defendant's Affidavit in Support of Motion for Summary Judgment, ¶ 7). Accordingly, Defendant could have shared salient aspects of this information with Plaintiff in its response to his QWR and, if not, was bound to explain why. *See Santander Bank*, 2013 WL 6046012, at *14. Defendant did neither.

In any event, there is no question that Plaintiff's attorney's May 23, 2012 letter was a QWR for purposes of RESPA. (Doc. No. 34, P.8, n.2.) It is likewise undisputed that that QWR called on Defendant to see if Wells Fargo made a mistake when applying Plaintiff's January 2010 payoff, and that Defendant's response provided little if any insight into that query. In short, Defendant's response, in the court's view, violated the RESPA statute. *See* 12 U.S.C. §§ 2605(e)(2)(C) and (f).

Unfortunately for Plaintiff's cause that does not end matters. To succeed on a compensatory claim, a plaintiff must demonstrate both a violation of the statute and actual damages caused by the RESPA violation. *Foregger v. Residential Credit Solutions, Inc.*, 2013 WL 6388665, at *5 (D. Mass. Dec. 5, 2013). *See also* Adam Levitin & Tara Twomey, *Mortgage Servicing*, 28 Yale J. on Reg. 1, 55 (2011) ("RESPA's significance for servicing is not the rights it grants, but those it does not. RESPA does

not allow borrowers to choose their servicer or have any say in how the servicer handles their loan beyond complaining of errors.").

Here, the court concludes, the RESPA violation did not cause Plaintiff any *actual* damage, which, as alleged, boils down to an assertion that the violation somehow placed him on an irreversible path to foreclosure. That damage, however, could not have been caused by Defendant's failure to adequately respond to the QWR on July 6, 2012, after pre-foreclosure proceedings were well underway. Still, Plaintiff seems to argue that, had Defendant only remedied the January 2010 payoff error identified in the QWR in 2012 -- if error it was -- then the intervening events would somehow have been negated. This argument cannot carry the day; as described, Plaintiff's claim that Defendant miscalculated the balance due after his January 2010 payoff had long before been forfeited when he executed the April 2011 forbearance agreement, which definitively set forth a precise balance due.

Nor has Plaintiff put forth any evidence that he might succeed on a claim for *statutory* damages under RESPA. For the court to grant such damages, there needs to be a showing that Defendant engaged in "a pattern or practice of noncompliance." *Urbon v. JPMorgan Chase Bank, N.A.*, 2013 WL 1144917, at *3 (D. Mass. Mar. 18, 2013). Granted, Plaintiff argues that Defendant's responses to his telephone inquiries about the payoff were consistently non-responsive. RESPA, however, contains no provision requiring that servicers provide thorough responses to borrowers' telephone inquiries. *See McCarley v. Household Fin. Corp., III*, 2008 WL 276330, *1 n.5 (M.D. Ala. Jan. 30, 2008) (oral communications do not "invoke a duty to respond under RESPA"). Accordingly, the only RESPA violation Plaintiff has supported is Defendant's

13

failure to adequately respond to one written QWR.  Simply put, that one failure is not enough to demonstrate a pattern or practice of noncompliance for purposes of statutory damages.  *See, e.g.*, *In re Maxwell*, 281 B.R. at 123 (citing more egregious cases and concluding that "just two" RESPA violations does not establish a pattern or practice). Accordingly, summary judgment is appropriate in Defendant's favor with respect to Count 1.

### 2.  VA Regulations

Counts 5 and 7 concern the mortgage power of sale, which Defendant appears to concede is restricted by the condition that it comply with the VA statutes, 38 U.S.C. §§ 101 *et seq.*, and the regulations issued thereunder.  Here, Plaintiff seeks a declaration that Defendant failed to comply with those regulations and, as a result, is precluded from exercising its power of sale.

The VA regulations at issue are 38 C.F.R. §§ 36.4350 (a) and (h).  In applicable part, subparagraph (a) provides that "[t]he holder of a loan guaranteed or insured by the Secretary shall develop and maintain a loan servicing program which follows accepted industry standards for servicing of similar type conventional loans."  In turn, subparagraph (h) provides that:

> The holder shall solicit sufficient information to properly evaluate the prospects for curing the default and whether the granting of forbearance or other relief assistance would be appropriate.  At a minimum, the holder must make a reasonable effort to establish the following: . . . (5) A realistic and mutually satisfactory arrangement for curing the default.

38 C.F.R. § 36.4350 (h).

The parties agree that these regulations are informed by VA Circular 26-10-06

("the Circular"), which lays out the industry standard for a VA Guaranteed loan.[1]  The

purpose of the Circular "is to ensure that veteran borrowers receive the opportunity to

be considered for affordable loan modifications when other home retention loss

mitigation options are not feasible."  VA Circular 26-10-06, §1 (May 24, 2010).  To that

end, the Circular requires that servicers "evaluate defaulted mortgages for traditional

loss mitigation actions" and employ those actions if the payments are affordable.  *Id.* at

§3(a).  An 'affordable' payment is defined to be less than 31 percent of gross monthly

income.  *Id.* at §§ 2 and 3(b)(1).  If the payments are not affordable, the servicer must

"evaluate the loan for a HAMP-style modification," which would change the loan by

decreasing interest to as low as two percent and increasing the term to as long as forty

years in pursuit of an affordable loan payment.  *Id.* at §§ 2, 3(a), 3(b), 3(b)(1)-(4).  In all,

the regulations afford mortgage-holders some leeway when negotiating with defaulted

borrowers, but the Circular is more concrete: traditional loss mitigation payments are to

be no more than 31 percent of gross monthly income, otherwise the borrower should be

evaluated for a HAMP-style modification.

    Here, Plaintiff complains that Defendant inappropriately offered a loss mitigation

action, namely, the forbearance agreement, that was not affordable.  For many of the

reasons explained above, however, that argument comes too late.  If Plaintiff could not

have afforded the payments called for by the forbearance agreement, he was entitled to

reject the agreement and assert his rights under the VA regulations.  Instead, Plaintiff

chose to accept the agreement and, consciously or not, waive the condition to the

---

[1]The Circular is available at
http://www.benefits.va.gov/HOMELOANS/circulars/26_10_6.pdf.

power of sale that his VA protections be honored.  *See McCarthy v. Tobin*, 706 N.E.2d 629, 632-33 (Mass. 1999) (conditions may be waived by words and conduct).  Plaintiff did not hold Defendant to the VA regulations' definition of affordability then, and he may not do so now.

Nor is there an issue of fact regarding the "HAMP-style" modification offered by Defendant.  *See Stagikas v. Saxon Mortg. Servs., Inc.*, 795 F.Supp.2d 129, 132-133 (D. Mass. 2011) (discussing goals and incentives of HAMP).  Once it became clear that Plaintiff could not afford the forbearance agreement payments, it is undisputed that Defendant considered him for a HAMP-style modification but determined that he did not have sufficient income.  Further, there is no evidence of record tending to show that Plaintiff could have afforded the modification.  To be sure, Plaintiff makes much of the fact that Defendant initially concluded that he passed the net-present-value test used to evaluate whether a borrower qualifies for a HAMP modification.  The Circular, however, provides that, when determining the feasibility of *HAMP-style* modifications, the mortgage-holder is not required to use the net-present-value model.  VA Circular 26-10-06, § 3(b)(2) (May 24, 2010).  In short, there is no material factual controversy regarding Defendant's compliance with the Circular, and summary judgment must be granted to Defendant with respect to Plaintiff's VA regulatory claims.

B.  Count 4: Violations of Mass. Gen. Laws Chapter 93A

With respect to Count 4, Defendant argues that Plaintiff failed to comply with Chapter 93A's requirement of a demand letter before filing suit.  Plaintiff replies that a subparagraph of section 9(3) of the chapter excused that requirement.

Generally speaking, a prospective plaintiff, at least thirty days before filing a 93A

claim, must send to the expected defendant a "written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered." Mass. Gen. Laws ch. 93A, § 9(3). The demand letter is not required, however, "if the claim is asserted by way of counterclaim or cross-claim, or if the prospective respondent does not maintain a place of business or does not keep assets within the commonwealth." *Id.*

Reading the last phrase of Mass. Gen. Laws ch. 93A, § 9(3) in the disjunctive, Plaintiff asserts that there was no need for a demand letter if Defendant, as the prospective respondent, *either* had no assets in the Commonwealth *or* did not have a place of business here.[2] For its part, Defendant reads the last phrase of the provision as conjunctive, *i.e.*, a demand letter is not required when the would-be recipient has no assets *and* no place of business in Massachusetts. Here, Defendant asserts, while it did not have a place of business in Massachusetts, it did have assets -- real property on Light Street in Lynn -- thereby requiring Plaintiff to send a Chapter 93A demand letter. The court finds Defendant's interpretation of the statutory provision far more persuasive.[3]

Most courts construing the 93A demand letter exception have at least assumed that the 'or' in the statue is conjunctive. *See Calautti v. American Home Mortg. Serv.*

[2]As a fallback position, Plaintiff maintains that the QWR should be deemed a Chapter 93A demand letter, but that argument is weak at best. The QWR, the only letter sent to Defendant, neither clearly described an unfair or deceptive practice nor stated the injury suffered.

[3]Plaintiff's unsworn and unsupported statement that ownership of the Lynn property is disputed is unpersuasive.

*Inc.*, 2012 WL 5240262, at *5 (Mass.Super.Ct. Aug. 7, 2012); *Lindsay v. Wells Fargo Bank, N.A.*, 2013 WL 5010977, at *16-17 (D. Mass. Sept. 11, 2013); *Sumner v. Mortgage Elec. Reg. Syst. Inc.*, 2012 WL 3059429, at *7 (D. Mass. Aug. 14, 2012); *Okoye v. Bank of N.Y. Mellon*, 2011 WL 3269686, at *4 (D. Mass. July 28, 2011); *In re Anderson*, 2006 WL 2786974, at *1 (Bankr.D.Mass. 2006).  One court, however, declared that the "or" is disjunctive, albeit with little analysis.  *See Paisley v. GMAC Mortg., LLC*, 2011 WL 1663092, *1 (Mass.Super.Ct. Feb. 25, 2011).

"'Determining the meaning of *or* in a sentence is not just a matter of declaring that the word is disjunctive.  Context matters.'" *Salvador* v. *Liberty life Assurance Co. of Boston*, 2014 WL 3749206, at *10 (D. Mass. July 28, 2014) (quoting *Schane v. International Bhd. of Teamsters Union Local No. 710 Pension Fund Pension Plan*, 760 F.3d 585, 590 (7th Cir. 2014)) (emphasis added).  Here, "[t]he only logical way to understand Chapter 93A's demand letter exception is that it is intended to exclude a class of potential defendants who lack minimal contacts with Massachusetts."  *In re Mitchell*, 476 B.R. 33, 58 (Bankr.D.Mass. 2012).  The court agrees; in the context of the purpose thoughtfully and succinctly articulated in *Mitchell*, the "or" should be construed as conjunctive.

Thus, considering the statutory provision in the positive, albeit carefully, *see Youtsey v. Avibank Mfg., Inc.*, 734 F.Supp.2d 230, 234 (D. Mass. 2010), the court finds that the following language:

> The demand requirements of this paragraph shall not apply if the claim is asserted by way of counterclaim or cross-claim, or if the prospective respondent does not maintain a place of business or does not keep assets within the commonwealth.

becomes

> The demand requirements of this paragraph shall not apply when the
> claim is asserted by way of counterclaim or cross-claim but do apply when
> the prospective respondent maintains a place of business or keeps assets
> within the commonwealth.

*See Schane*, 760 F.3d at 789 ("*not* (X or Y) is equivalent to not X and not Y"). This

conjunctive reading provides a more accurate understanding of the statute.

Accordingly, given that Defendant had assets within the Commonwealth, Plaintiff was

required to first send a Chapter 93A demand letter. Plaintiff not having done so,

Defendant's motion for summary judgment will be allowed as to Count 4.

C.  Counts 2 and 3: Defendant's Duty to Notify

One of the two remaining counts, Count 2, alleges defects in what Defendant

purports to be a statutorily-required notice of Plaintiff's right-to-cure sent on November

18, 2010. The parties dispute whether the notice accurately reflected the amount due,

which dispute, the court finds, forecloses summary judgment.

Defendant argues that, even if the right-to-cure notice did not comply with Mass.

Gen. Laws chapter 244, section 35A, that violation, alone, was not so egregious as to

jeopardize its ability to foreclose on the property. In response, Plaintiff argues that he

has the right to petition a court to enjoin foreclosure if the right-to-cure notice is in any

way defective, specifying several ways in which the notice was or may have been

technically inaccurate. In addition, Plaintiff explains that, had the notice reflected what

he believes to have been the actual balance due, $1,015.98, he could have cured his

default. This time, the court concludes, Plaintiff has the better argument.

Chief Justice Ralph D. Gants recently addressed the right-to-cure notice

requirement in a concurrence regarding remedies in a *post-foreclosure* context, *i.e.*, an eviction.  The instant action, of course, concerns a possible *pre-foreclosure* remedy since Defendant has not yet foreclosed on Plaintiff's home.  Justice Gants explained that, to undo a foreclosure for failure to comply with the right-to-cure notice requirement, a mortgagor must show that the violation was "so fundamentally unfair" that he would be "entitled to affirmative equitable relief."  *U.S. Bank Nat'l Ass'n v. Schumacher*, 5 N.E.3d 882, 891 (Mass. 2014) (Gants, J., concurring).  As to possible *pre-foreclosure* remedies, Justice Gants explained the following:

> [W]here a homeowner who is facing foreclosure claims that the mortgage holder has failed to provide timely and adequate written notice of the right to cure the default in payment of the mortgage, in violation of § 35A, the homeowner may file an equitable action in Superior Court seeking to enjoin the foreclosure . . . . [T]he foreclosure may not proceed if the mortgagor proves that the mortgage holder has failed to give the required notice . . . . [In that case,] the mortgage holder must provide the proper notice required by § 35A and wait to see if the borrower will cure the default within the required time period before recommencing the foreclosure proceeding.

*Id.* at 890 (citations and internal quotations omitted).  Justice Gants did not define "adequate written notice," but he appears to have reasonably chosen a lower hurdle for relief in the *pre-foreclosure* than in the *post-foreclosure* context.  This stands to reason; it should be more difficult to undo a foreclosure which has already taken place than to forestall a pending one.  Indeed, just days ago, the Massachusetts Appeals Court indicated that the "fundamental unfairness" standard does not apply in a pre-foreclosure equity action, although it left open the question of "what type of defect in the notice would entitle a mortgagor to [pre-foreclosure equitable] relief."  *Haskins v. Deutsche Bank Nat'l Trust Co.*, -- N.E.2d -- , 2014 WL 5800489, at *2 n.11 (Mass. App. Ct.

November 10, 2014).

It is clear to this court, however, that a notice of a right-to-cure which sets forth the wrong amount due is at odds with the governing statute, *see* Mass. Gen. Laws ch. 244, § 35A (h)(1) (notice must state "the sum of money required to cure the default"); *Schumacher*, 5 N.E.3d at 890 ("§ 35A is designed to give a mortgagor a fair opportunity to cure a default"), if not fundamentally unfair as well.  Whether the right-to-cure notice sent to Plaintiff here reflected the proper amount due is an issue of material fact and, therefore, summary judgment on Count 2 would be inappropriate.

Similarly, Count 3 survives Defendant's motion for summary judgment.  Mass. Gen. Laws chapter 183, section 21, provides that a mortgagee must comply with the terms of the mortgage before it may sell the premises.  Here, the mortgage provided that, prior to its acceleration, the lender must notify the borrower as to: (a) the default, (b) what is needed to cure the default, (c) the date by which the default must be cured, and (d) the fact that failure to cure may result in acceleration.  As described, there is a genuine issue of material fact as to whether Defendant provided Plaintiff with the proper payoff amount, which, if resolved in his favor, would entitle him to relief.  Accordingly, summary judgment will be denied with respect to Count 3.

## IV. CONCLUSION

For the foregoing reasons, the court allows Defendant's motion for summary judgment with respect to Counts 1, 4, 5, 6 and 7, but denies the motion with respect to Counts 2 and 3.

IT IS SO ORDERED.

DATED:   November 14, 2014

 /s/   Kenneth P. Neiman   
KENNETH P. NEIMAN
U.S. Magistrate Judge